Pension Fund, Arguments Not to Exceed, 15 Minutes per Side, Mr. Salewalkie for appellant. Good morning. Good morning. Please, the court, David Salewalkie on behalf of the pension fund. I would like to reserve five minutes if I could. Fine. Thank you so much. We are here today regarding ACE's withdrawal from the pension fund. There is no issue, there was a withdrawal. The issue in this case, as the court is aware, is the interest rate assumption utilized by the fund for purposes of calculating ACE's withdrawal liability. The fund's actuary used the 2.27 interest rate derived from the PBGC rates. When the actuary analyzed that rate in conjunction with this fund's actual investments, it had a probability of meeting or exceeding returns of 76.7 to 94.5. It is our position that both the arbitrator and the district court erred because ACE has not proven by a preponderance of the evidence that using a rate based on a methodology of having a higher probability of success other than say 50 percent was unreasonable or unlawful. The court below and the arbitrator basically found the use of the rate because it was derived from the PBGC to be unlawful and basically relied on the SOFCO case from this court from 2001 to reach that conclusion. I'm going to talk about that in a moment. There's also a cross appeal filed by ACE against the fund seeking to have this court impose the 7.75 interest rate which is what the fund uses or used because it doesn't use it anymore for minimum funding. The evidence in the record is that that rate only has a 50 percent threshold of being successful or meeting the returns. In fact, the number used by counsel in its pleadings and at the hearing is 45.1 percent, so less than 50 percent. This 50 percent rate, it seems like to me that suggests that the odds of the fund having enough to fund in the future, 50 percent it would be and 50 percent not. Yes, sir. That seems that would be sort of putting the withdrawing employer and the existing employers in the fund really on the same playing field, doesn't it? If it's greater than 50 percent, that would mean that the people who stay in the fund are getting the benefit of, for instance, if the market does better than what the 7.75 percentage is implying, they get the benefit of that, right? Yes, your honor. But they also suffer if it goes below. But if it's 50-50, they have the same odds of either doing better than the 7.75 or worse than the 7.75. And I don't understand why there should be some calculus that would give them a better shot at making a better, you know, only 30 percent of the time they would go lower than the 7.75 versus the 70 percent of the time they're going to go better than the 7.75. Correct, your honor. And that, you have hit the exact issue in this case because that is the methodology that the actuary used. No, they didn't. The actuary did not use that methodology. I'm saying if you use the 50-50, it would be then equal. But that's not what the actuary used. Correct. It seems like he used a methodology that favored the employers that stayed in the fund. And that's what I'm trying to understand why that would be relevant to calculating the interest rate given that I think it's supposed to be based on the performance of the fund, not on the likelihood of success in the stock market. And I would state in response to that, your honor, that how the returns do, how the investments do, there is going to be a threshold of how well they do. And it's going to be 50 percent if it's 7.75 or we find with the 2.3, it's 76 to 94. And to answer the question, the reason the actuary utilized that methodology of having the higher threshold, not the methodology of having even money, is because it's withdrawal liability. And because this particular fund has been in the critical status for going on 15 years now. And I'm not sure when it's going to come out. It's still in the low 60s for funding. It still has a negative credit balance. The 7.75, which has been lowered to 7.5, hasn't worked. The rehabilitation plan has been modified three different times and hasn't worked. And so when you're talking about... Is there any, apropos of Judge Bush's question, is there any case that says that you should use a rate that will result in the 50-50? Or you should use a rate that should result in a higher percentage or a lower percentage? Or is that just not relevant to what rate is appropriate? I think it's relevant to what rate is appropriate based on what the actuary does. It's his decision. It's his work product. It's his science, basically, the actuarial practice. Does any other case say that a 50-50 likelihood is appropriate consideration or is not? Or is this just a new thing in this case? It's a new thing in this case. In fact, after the Sofco case, if you look at all the cases, and we did a chart on all of them, obviously, all of them failed for the same reason that Sofco failed. And that's because they didn't look at the actual investments of the fund. They didn't look to see how those investments would do. They just nailed a number. Did this actuary look at the actual investments of this fund? He did, yes, Your Honor. That's where he came up with the 76.7 to the 94.5 on the 2.3. He actually took these investments, ran it through the exact same modular that he runs through to get to the minimum funding rate. So he looked at the exact same investments. I thought that the arbitrator, and correct me if I'm wrong, that the arbitrator said the actuary didn't look at performance of the actual investments. It's very interesting that you say that because the arbitrator did say that. The arbitrator said that he didn't look at the investments and that he didn't anticipate the experience of the investments after saying several times throughout the long award that he did. And then the district court also acknowledged the methodology of looking at the investments and the probability. I just think that they felt hamstrung by the Sofco case that had a component of the PBDC rate and said that was unlawful. But there's a big difference between our case and the Sofco case. What is the difference? Why doesn't Sofco say what the actuary did here was wrong? And the best way to answer that is to see what the actuary actually did in Sofco, right? What the actuary did in Sofco was treated the requirements or the test to pick an interest rate as a procedural rule only. In other words, he didn't have to look at how the investments did. And he did not. If you read the Sofco case, it's very clear you don't know anything about the investments or that fund or what they would do in that case. He looked at his professional guidance that said you could treat it as a settlement and you could pick an annuity rate and he did. And he did in every case. He didn't care what this fund actually did and he did it to transfer risk, a policy to transfer risk, not a result. It was the reason for the choice of that rate. And then all the cases that followed that, all of them, Energy West, the GCIU cases in California, all of them, there's 10th Circuit, 2nd Circuit, every one of those cases did the same thing. He said we don't care. It's a procedural rule. Whatever we pick is right. Well, that's not what the actuary did in this case and the actuary can't do that in this case because in Sofco this court said he can't. He has to look at the actual characteristics and in particular the investments. And what he's saying is look, I want a rate because this is a final settlement. I can't fix this. If COVID happens and we go negative investments, I can't change it. I can't do anything. All the other employees, Barton, Mallet, Catt, they're all going to have to pay this guy's freight. I'm sorry that I'm getting lost a little bit. Did the actuary pick this 2.27 rate from the pension benefit board? Yes, that's exactly what he did, John. I thought that rate was based on investing in an annuity. Am I right? That's exactly where that rate comes from, yes. That wasn't the actual investments here. It was not. So that's an important distinction to make because in those other cases, they picked that rate just to pick a settlement rate. Here, that's where he got the rate because his professional guidance, which he's allowed to follow, says he can. And if he would have stopped there, then this rate would be unlawful. But in Sofco, part of the holding was that you couldn't just rely on the fact that it's in the professional guidance. You have to look to the statute itself. That's exactly right, Your Honor. That's exactly what he did. That's what I was just about to say. If he would have stopped by just picking that rate, then we wouldn't be here. We'd have to fire him because it would have been unlawful. He ended up with that rate. He picked that rate and then he compared it. He ran it through the same modular he does to get to that minimum funding rate to get that probability. And for withdrawal liability, his methodology is to have a higher probability because he can't fix it if he gets it wrong. But suppose that if any person with any knowledge looked at the investments of this fund in the past and found that they were earning at a 5% rate, then should the 5% rate be sort of the starting point for the actuary? Well, it is a factor because you don't want to... What's the saying? You don't look in the rear view mirror. That's one other thing. You do look in the past and the geometric returns in 10-year periods were 3.5%. So why wouldn't that be the appropriate rate rather than the 2.7 or whatever? Because it's only looking backwards, Your Honor. So looking forward, what are we predicted to do? So he takes these investments and he runs it through his modular to determine what are the different probabilities and that's where he came to the 76 to 94, which he felt more comfortable with than a 45.1% that is being advocated for by ACE. I see your time is up. Thank you very much. I appreciate the questions. Thank you. May it please the Court, my name is Kevin Williams and I'm the legal counsel for ACE Saginaw Paving Company. ACE is an operating division of the Edward C. Levy Company. You have before you a withdrawal liability dispute between my client and this pension fund. In 2018, my client incurred a partial withdrawal from this pension plan. They were assessed approximately $16.3 million. The assessment was based on the PBGC interest rate. In 2018, that rate was 2.27%. The PB, as you said, the PBGC interest rate is the rate of return on risk-free annuities. This plan does not own any annuities. It has 61% of its assets in equities and the balance of real estate and fixed investments. So for purposes of using the PBGC rate, the plan actuary, Mr. Feldman, assumed that 100% of this plan's action, this plan's assets were in annuities. But wouldn't that be a safe prediction as to what a safe investor like the fund would be able to get if the fund, for instance, predicted that the stock market would go down and they wanted to get out of equities right away? Well, as this Court said in SOFCO, you have to base it on the actual assets owned by the pension plan and the return on those assets. So you base it on the assets owned on a particular day. Right. And doesn't that run a big risk if you're saying, well, they earn 10%? That those assets could be in some equity that's going to go downhill fast and that a prudent person would get out of that quickly. So why should the person, the entity withdrawing, get the benefit of a one-time wonderful investment that is not going to be a long-term investment when the obligations of the fund are going to come due to pay these retirees for their retirement benefits? First of all, it's important to emphasize that the Board of Trustees decides the asset allocation for the pension fund. And they did so in their investment policy. The actuary has no role in that, as this Court said in SOFCO. They can't, the actuary can't dictate to the Board what the assets are. That's a decision. Now if you look at historically, this plan has gotten an 8.2% return on investment. From 1984 inception to the withdrawal in 2018, they got an 8.2% return. Higher than the minimum funding rate of 7.75%. Is there any case, though, that says that you would look at the actual rate up until the day that the actuary is computing what rate should be used for the withdrawal liability and that that should be the rate? So you've told us 8.2%. Essentially you're saying that should be the rate. What case? No, I'm not saying that. But I was worried that you were telling me that. No, no, no. You're not saying that. Our position is that the minimum funding rate of 7.75% was Mr. Feldman's best estimate of anticipated experience under the plan and that should be used. Should it always be used, though? Is that what you're saying? That the minimum, that the amount that's the minimum funding rate, which everyone agrees is something like 7.5%, that that has to be used for withdrawal liability? Or are there different factors for withdrawal liability that are pertinent? No. Under section, the pertinent section of the statute is 1393. Okay, that sets forth the standard for the actuary to set the interest rate assumption for withdrawal liability. And it must be reasonable, it must be his best estimate of anticipated experience under the plan. Anticipated experience has to take into account past experience. Past experience is the 8.2% investment return. So, and it has to be based on the actual assets owned by the plan. And this plan owns no annuities. So... Why does that make sense? The PBGC rate is based on annuities and why does that make such a difference here? Why does it make a difference? Because when you use the PBGC rate, you essentially increase plan underfunding and triple the withdrawal liability of the employers in the plan. My client was... No, I know what the outcome of using it is, but why is it, why is the fact that the PBGC rate is an annuity rate, why is that such an important thing to be taking into consideration? Because it doesn't take into account the characteristics of this plan. Well, suppose that every finance person, every economist says the historic rate is unduly high because of some event or some development in IT or whatever. And we know we're going into a deep recession. In fact, we think we're going into a depression. So why should we use the historic rate only as opposed to this, I'm assuming, hypothetically, everybody knows we're in a depression. It's 1930. Right. Well, first of all, the historic rate is 8.2%, right? And counsel for the fund has already mentioned that this plan has lowered its minimum funding rate. It's lowered it from 7.75 to 7.50. I think every year or every two years, they do actuarial reports. And so they can adjust it. They can adjust it on a year-by-year basis if they want. Doesn't that prove your opponent's point that if the minimum funding rate is for people who are staying in the plan, whereas your client is getting out of the plan and will never have to deal with a different rate in the future? You're locked in. Yes. This case is all about risk transfer, if I may say so. Let me make sure I understand. But your client gets the benefit of any bad years ahead that would lower the rate, but it also misses the upside of any years ahead that would give it a better rate than 7.75. And as I understand it, the 50-50 risk transfer would show that your client is, yes, it's missing out on the bad years, but it's also missing out on the good years. That's correct. And that's the reason you have 50-50, because there are both scenarios that can happen. That's right. If you use the PBGC rate, you're transferring 94% of the risk to my client. What that means is there's 9 out of 10 years, the actual investment returns of this plan will exceed the PBGC interest rate. If you use the 7.75 minimum funding, it's a 45% chance. So it's relatively risk neutral. Now we've had a 20% return. Is there a case that says that you must have the actuary using the 50-50 risk transfer? No. But it goes to the risk transfer argument. That's what this court addressed in SOFCO. But there are cases saying that you shouldn't be favoring the existing companies, the companies that stay over the company that's leaving. That's right. There are cases saying that. That's what you said in SOFCO. You said that Congress did not authorize risk transfer when there's an individual withdrawal in the plan. It only is authorized when there's mass withdrawal by all the employers in the plan. What Mr. Feldman and all these actuaries are doing is transferring risk. And he runs his probability test to see how much risk he's transferring. And he's transferring 94% of the risk to my client by using the PBGC rate. He's not allowed to do that under the statute. Another question though is the arbitrator overturned what the actuary did and said it should go back to an actuary to recalculate. And the district court affirmed. So are you asking for anything different than that we affirm the district court, which affirmed the arbitrator, which said the actuary was wrong and there should be recalculation? Yes. Our cross appeal issue is we're asking you to mandate that the fund recalculate my client's withdrawal liability using the 7.75% interest rate. You want 7.75 even though the minimum rate now is down to 7.5? Correct. Why? Because you have to use the law in effect when the withdrawal occurred in 2018. Why is it though that the minimum rate is necessarily the same as the withdrawal rate given that the time horizon is different? As I understand it, for withdrawal it's a 20 year time horizon. And for the minimum rate it's about an 80 year time horizon. So wouldn't that be a reason alone for there to be different rates for the minimum amount versus the withdrawal amount? That's an argument they made on rate. There's no evidence in the record. That's just math. What? That's just math. Right, right. But all the information in the record goes to the withdrawal liability interest rate period. So if you look at the past investment returns, that's a 26 year period. It's 8.2%. Mr. Feldman does a survey of his peers. That's the 2018 survey of capital market assumptions. They look at a 20 year period. Mr. Feldman's peers say they're projecting a 7.5 to 8% return over the next 20 years. And that's why he had a reasonable expectation that his 7.75% was a fair interest rate assumption for minimum funding. It's right in the middle. And he even... Has it been your position all along that it should be the 7.75% including through the arbitration? Yes. Yes. And that's what happened in SOFCO. After this court found that the Siegel blended rate was unlawful, you imposed the minimum funding rate because it was based on... Do you have any case law saying that it has to be the same, the minimum rate and the withdrawal rate? That it has to be the same? Yeah. No. Because doesn't the case law say it doesn't necessarily have to be the same? Correct. And this court in SOFCO... So why would this be different, again, from the normal case where it could be different? Why? Yeah. Because the 7.75% rate was Mr. Feldman's best estimate of anticipated experience under the plan. He says and testifies that he agrees that there's a high likelihood that the actual 30-year period, which is the withdrawal liability period they talk about, will meet or exceed the 7.75% rate. It's consistent with past investment returns of 8.2%. It's consistent with his peers' survey of forecasting over a 20-year period, 7.5% to 8%. So it meets all the requirements of SOFCO for using the minimum funding rate when the PPGC rate is found unlawful. We are not usually considered to be very good actuaries as judges. That's such a wild statement. Thank you. So why shouldn't we do what the arbitrator did? If we agree with your basic theory and send it back to the actuary, at which point the actuary is supposed to use his best estimate, and I don't have the magic words in front of me, but there is a lot of reasonableness for directing the actuary. And then, if you disagree with it or your opponent disagrees with it, then you can insist on arbitration and do this again. Two reasons. One, he already has given his best estimate and it's 7.75%. We don't need a redo. But he said that he, meaning the actuary, we should be clear who he is. Yes, the actuary said it. But in the context of minimum funding amounts. Right. And that's what occurred in SOFCO. The other argument, and I see my time's up, is waiver. Over a year ago, the fund was given the opportunity and the plan actuary was given the opportunity to come up with either a similar rate to the minimum funding rate. They said they can't do it. They're not going to do it. So you have a relinquishing. Your time actually is not up, I don't think. Let me ask you another question. What about the evidence about the fund's lawyer being involved? Are you relying on that for anything? There seemed like some evidence of their being involved in editing the auditor's work or something like that. Oh, right. Right. What's your question? I'm sorry. Does that support your case that this was not an appropriate calculation? What it shows is that the plan actuary, Mr. Feldman, didn't comply with the law. He makes his statement, there's this draft letter which occurs in 2019, April of 2019, where he says nothing under the law requires me to look at long-term investment returns. Well, that's what he's required to do. Fund counsel sees that, not this counsel, but Nancy Pierce, and she deletes that. She knows it's not complying with the law. So that's the relevance. She knows he's not complying with the law and he isn't complying with the law. Was this presented to the arbitrator? Yes. And what did the arbitrator say about it? Well, that's why the arbitrator says you've got to redo this. You've got to look at past the investment returns and expect past and expected investment returns. You didn't do it. Any further questions? Thank you. Thank you. The first thing I have to say, in defense of legal counsel in Michigan and Nancy Pierce, there is zero evidence in the record that she did anything of the sort. It's just a theory. In fact, I would say on that draft memo, he was talking about minimum funding being the long-term investments, but neither here nor there. Is this man Feldman, is he still the actuary for the fund? Yes, he is still the enrolled actuary for the fund to this date. One thing I want to also respond to is I am not aware of any cases, and we looked hard, that has a rule that the interest rate for withdrawal liability must be risk neutral. I'm not aware of any cases that require that whatsoever, because that would require the minimum funding rate, which we know there is no law that says it has to be that. And then I look at the Erbhardt case, which is the other primary case from this circuit, where it says the exact purpose of withdrawal liability is to deter withdrawals and to mitigate the damages to the fund and the other employers when somebody does withdraw, otherwise they shouldn't have to take the chance. To penalize the withdrawing employer? Not to penalize. It says to deter, to mitigate. In other words, the purpose of withdrawal liability is to protect everybody but the withdrawing employer. That's just what it is. That's what it was created for. It's not meant to be fair. It's right in the legislative history and in every case, including Sofco and Erbhardt. But I don't see that in the statutory text. What text are you pointing to? I'm not pointing to any text, Your Honor. I'm just saying the purpose of withdrawal liability is to set the final settlement of the withdrawing employer. Of a Hotel California, in other words. Is it in the legislative history? Is it in the legislative history of the withdrawal liability provisions? It is, and it's also cited by this Court in Erbhardt that it's meant for deterrence. And it's meant to protect the fund and the other contributing employers. The other thing I would like to say just quickly is it's important to talk about what Sofco didn't say. Sofco did not say the two rates have to be the same. Sofco did not say they have to be risk neutral. Sofco did not say you don't look at your professional guidance. In fact, the rules seem to say that you should, and the Supreme Court said that you should. And so that's what he did. And we have to remember, he's not pretending that his best estimate is one thing and then diluting it like the actuaries did in these other cases in Sofco. He just got the rate from there and then he ran it in the same way he runs all the investments to get the 775 and has a methodology for the purposes of withdrawal liability of a higher threshold success for this fund based on this fund's experience. He doesn't use that rate on funds that are in dire straits like this one is. Have there been other employers who have withdrawn from this fund? There has been. In fact, we had an arbitration decision upholding this rate right after this one. Then it went to the district court and right after the district court upheld the arbitration decision, so they vacated the arbitration decision. That's right behind us. We just briefed, filed the first brief on that case because the other side didn't want to stay. That's the only other case that you know of? There's another one that's in a holding pattern until the decisions in these cases. There's been a lot of other withdrawals actually. They haven't all raised the issue. So I guess an interesting question would be is the same rate being used in these various cases? Absolutely. They don't change by employer. It's one rate for withdrawal liability, one rate for minimum funding. And the rate for withdrawal liability that's determined in 2020 would be the same as the rate that would be determined in 2024, or are there different factors that weigh in? There would be different factors. I don't have any current ones up. All the other ones are from the same year, but the PVC rates themselves change. Interest rates are up right now. Investments were up in 2023 or 2022, so those rates went up. So I haven't done the analysis and I haven't seen the analysis because the case hasn't come up yet, but I'm sure it's the same analysis. You're looking at the investments and you're comparing it to the rate to see if it makes sense. So if we send it back to the district court with instructions to send it back to an actuary at the fund, would they be looking at the same year that the withdrawal was sought, which I'm hearing is 2018? That's correct. The measurement year was April 30, 2018. That wouldn't change at all? It would not change. You'd look at the investments at that time. You might have a better idea how they do, but you'd look at it from that angle. That was what you're required to do. You have to look at that measurement date, what everything was at that time. So that's where that would be. I just want to end with this because I really feel it's important to note that ACE simply hasn't proven by reponding to the evidence that this methodology is unreasonable or unlawful. That's why we think the appropriate rate was used. When you have a threshold of a success that is higher, it is doing exactly what withdrawal antibodies was created to do. My time is up. Thank you.  Thank you, Iris. Have a good day. Thank you both for your argument. The case will be submitted.